[Cite as *In re C.D.*, 2024-Ohio-446.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| C.D., | : | No. 22AP-649 |
| | | (C.P.C No. 17JU-4272) |
| [J.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant]. | : | |
| In re: | : | |
| C.D. et al., | : | No. 22AP-650 |
| | | (C.P.C. No. 17JU-14613) |
| [J.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant]. | : | |
| In re: | : | |
| C.D. et al., | : | No. 22AP-674 |
| | | (C.P.C. No. 17JU-14613) |
| [V.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant]. | : | |
| In re: | : | |
| C.D., | : | No. 22AP-675 |
| | | (C.P.C. No. 17JU-4272) |
| [V.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant]. | : | |

---

### D E C I S I O N

Rendered on February 8, 2024

---

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for appellant J.A. **Argued:** *Timothy E. Pierce.*

**On brief:** *William T. Cramer*, for appellant V.A.

**On brief:** *Robert J. McClaren*, for Franklin County Children Services. **Argued:** *Robert J. McClaren.*

---

APPEALS from the Franklin County Court of Common Pleas
Domestic Relations Division, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1}   In these consolidated appeals, mother J.A. and maternal grandfather V.A., appeal the October 20, 2022 order of the Franklin County Court of Common Pleas, Domestic Relations Division, Juvenile Branch, denying V.A.'s motions for legal custody, divesting J.A. of her parental rights, and granting permanent custody of J.A.'s three children C.D. (d.o.b. 09/06/14, hereinafter "C.D. 1"), C.D. (d.o.b. 02/20/16, hereinafter "C.D. 2"), and C.D. (d.o.b. 03/11/17, hereinafter "C.D. 3"), to Franklin County Children Services for purposes of adoption.  (Oct. 20, 2022 Decision & Jgmt. Entry at 20-30.)  J.A. asserts three assignments of error with the trial court's decision:

> [I.] The lower court's decision terminating Mother-Appellant's parental rights to parent her three children in 17JU4272 and 17JU141613 was not founded on sufficient evidence and ran against the manifest weight of the evidence.

> [II.] The lower court erred in granting PCC to FCCS when FCCS failed to make intensive efforts to identify and engage kinship caregivers and the lower court failed to make the findings necessary to relieve FCCS of that obligation under R.C. 2151.4115 et. seq.  The lower court's actions violated Mother - Appellant's Right to Due Process of Law under the Fifth and Fourteenth Amendments of the United States Constitution, the Due Course of Law provisions of Article I, Sections 1 and 16 of the Ohio Constitution, R.C. 2151.011(B)(2) and (B)(50), R.C.

2151.353(A)(3), R.C. 2151.4115 et. seq., Juv. R. 2(V) and 2(II), and R.C. 5103.23

[III.] The lower court erred when it failed to appoint separate counsel for [C.D. 1] when her wishes were inconsistent with the best interest recommendation of GAL Baron. The court's failure to due so violated the child's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the Due Course of Law provisions of Article I, Sections 1 and 16 of the Ohio Constitution, the Right to Counsel provision of Article I, Section 10 of the Ohio Constitution, and Juv. R. 4(A)

V.A., in turn, asserts a single assignment of error with the trial court's decision:

[I.] The agency failed to make intensive efforts to identify and engage kinship caregivers and the juvenile court failed to make the findings necessary to relieve the agency of that obligation under R.C. 2151.4115 et seq.

On review, we overrule all four assignments of error and affirm the judgment of the trial court.

{¶ 2} During the period after the permanent custody motion was filed, father C.D. apparently stopped participating in the case and communicating with his attorney, who withdrew from representation. In November 2019, R.A. and V.A. were added as parties and were permitted to pursue their legal custody motions pro se, and the children remained together in the same foster placement. According to a report filed by the guardian ad litem ("GAL") on January 31, 2020:

{¶ 3} Franklin County Children Services ("FCCS") initially became involved with J.A. and the children's father C.D. in late 2014, and in February 2015 FCCS filed a complaint alleging that C.D.1, then aged five months, was an abused and dependent child. C.D.1 had tested positive for opiates, oxycodone, and benzodiazepines at the time of birth, and J.A. had tested positive at the same time. Initially, a safety plan was adopted, and J.A. was recommended to services and drug screening, but she did not comply. As a result, on February 19, 2015, the court granted a Temporary Order of Protective Service ("TOPS") to FCCS and a Temporary Order of Custody ("TOC") to C.D.1's maternal grandmother R.A. The court ordered that parental visitation be supervised and for parents to drug screen. Subsequently, the court adjudicated C.D.1 to be an abused child and granted an order for

Temporary Court Commitment ("TCC") and placed C.D.1 in the custody of R.A. with continued Court Ordered Protective Supervision ("COPS") by FCCS.

{¶ 4} About a year later, C.D.1 was returned to J.A.'s custody and the COPS order was dissolved. But on March 31, 2017, FCCS filed a new complaint alleging C.D.3, then aged three weeks, to be an abused and neglected child for similar reasons—J.A. had apparently admitted to recent heroin use, and had failed to persist with drug treatment, and C.D.3 appeared to be suffering from withdrawal symptoms. After his birth, C.D.3 was kept in the hospital for several weeks, and J.A. had little to no contact with him. Father, C.D., also failed multiple drug screens and had never linked with services in the interim period. C.D.3 was ordered into the temporary custody of FCCS and was subsequently placed in the home of R.A. and V.A. C.D.1 and C.D.2 were also removed from J.A.'s custody, and on February 27, 2018, the trial court ordered C.D.1 and C.D.2 to be placed in the temporary custody of FCCS, and they too were placed with R.A.

{¶ 5} But on May 30, 2018, FCCS filed shelter care motions for all three children, arguing that J.A. had been spending all day at R.A.'s home to help care for the children, in violation of court orders, and when a caseworker made an unannounced visit to R.A.'s home on May 18, the caseworker discovered J.A. supervising the children on the front porch of the residence. J.A. ran with the children, and when the caseworker investigated further, R.A. reported to the caseworker that J.A. was not there. The court ordered that all three children be removed from R.A.'s care, and they were all placed in a foster home, where they have remained. In response to the filing of the shelter care motions, R.A. filed for legal custody of all three children, and on October 9, 2018, FCCS filed motions for permanent custody ("PCC") of C.D.1, C.D.2, and C.D.3. R.A.'s attorney withdrew from representation, and shortly thereafter, V.A. filed motions for legal custody of the children. His motions were dismissed based on his failure to appear at a hearing, but he then filed renewed motions to be made a party and for custody "because they are blood and I will take good care of them." (Nov. 20, 2018 Mot. to Set Custody at 1, filed in 17JU-4272; Oct. 23, 2018 Mot. to Set Custody at 1, filed in 17JU-14613.)

> Contact with the parents has been at the supervised visits at FCCS only. Grandparents attend family visits at FCCS every third Wednesday of the month. All other visits are with parents and children only. Prior attempts to speak with the grandparents have been met with resistance; at one visit the maternal grandfather stated that no one was going to talk with

GAL until his lawyer gave permission. The GAL has limited interaction with parents. Attempts to discuss progress or case plan issues has been at end of supervised visits at FCCS and rushed as the parents were trying to catch the COTA bus back to their home. All attempts prior to this have been to no avail, as mother did not answer her phone. Contact had been through text or third parties. Mother stated that she didn't have any minutes left on the phone plan. GAL attempted to contact mother at phone number on record, however, the number was not in service as of October 11, 2019. On January 13, 2020, Mother's community control was revoked in Fairfield County, and she was recently transported to Ohio Reformatory for Women to serve a 24 month sentence.

* * *

When Mother visited, she actively engaged with the children, playing with each child, getting on the floor to be at their level. When Father visited, he remained on couch for the most part, interacting in a more passive manner. When the children would go to be with him and he would engage at that time. Interaction by Father became more active over the last several visits, play wrestling with the boys and playing catch. However, parents have stopped visiting on or around August, 2019 and Mother is currently incarcerated, serving a two year sentence.

Grandfather has mobility issues, stays seated, but is attentive to the activities of the children. Grandmother spends most of the visit preparing the plates for food for everyone in attendance, drinks, cleaning up. Family often brings items for the children, toys, clothes, tablets. In the early visits, family would send extra food, snacks and toys and other items home with the foster family. This is no longer the case, the only exception when they have celebrated birthdays of the children.

* * *

Parents have not seen the children since July 2019 and have not spoken to them since September 2019.

Following the November 19, 2019 maternal grandfather's request for increased visits was granted and there were changes to the visitation plan. Visits between grandparents and children are now on a weekly basis. Notably, at the last observed visit, [C.D.2] was reluctant to go to the grandparents. He was resisting requests to sit with Maternal Grandfather and Maternal Grandmother in the waiting room while waiting to be taken to the room for the visit.

(Emphasis sic.) (Jan. 31, 2020 Guardian Ad Litem's Report at 5-9.)

{¶ 6} The permanent custody trial was continued several times. On January 20, 2022, the parties came together for trial, which was again continued, but on that date FCCS also requested the court to terminate V.A.'s visitations:

> MR. MCCLAREN: Yes, Your Honor. There was at the last time with the previous judge there's a mot -- there was visitation granted on one case number regarding a [C.D.3] and we would ask that that visitation orders rescinded. The visitation has not went as well with grandfather. His interactions consist of gift giving and junk food. He doesn't respect their boundaries. He has asked -- requires -- he's required the child to give him a hug and get on his lap when he didn't want to. Would require kisses of the children. Grandfather has told the caseworker she needs to force [C.D.3] to come to the visits and he was advised that we don't put hands on children to make them go. The children have stated they're going to visits for gifts and junk food. Grandfather doesn't engage in any bonding activities and his method of interaction give the children no choice but to engage.
>
> * * *
>
> There was an incident on December 8th where we asked grandfather what he would do to get the child out of the car when child refuses to visit. He states he would simply grab the child and take him out of the car like he would (inaudible) of a grocery store and suggested the children should be punished for not coming to visits. So we understand that [C.D.3] doesn't want to attend for the visits and the other two children while they're not under orders, we've had them come to act in good faith, but they do not seem interested in further visitation with the grandfather. We'd ask that that order be rescinded.

(Jan. 20, 2022 Tr. at 5-6.) The GAL agreed with this motion:

> MS. MUMAW: Thank you, Your Honor. We are in agreement with the motion. The children have repeatedly and vehemently stated that they do not want to go to these visits. They sit out in the car sometimes. They've been kicking and spitting and not wanting to go into the visit. They talk about not like being afraid of their -- of their grandfather, being uncomfortable. They don't want to do this.
>
> Your Honor, at this point today we would recommend PCC, but if there is to be reunification in this case, it would be with the mother who has been working the case plan. It would not be with grandfather. There are numerous reasons why he's not

> able to care for the children and it's not appropriate to continue to force children to try to bond with someone that they're afraid of, that they don't want to be around, that -- who is not respecting their boundaries. And Your Honor, with another continuance for I don't know how many more months, we don't want the children to be continued to be subjected to this.

*Id.* at 6-7. V.A. was not personally present at the hearing as a result of illness, but appeared by phone, and after hearing from V.A. and from his counsel, the court granted the motion to suspend visitation. V.A. filed a responsive motion on January 27, 2022, requesting visitation be immediately reinstated or in the alternative an evidentiary hearing on his motion. In the interim, the case was assigned to a visiting judge for trial, and that motion was heard at the time of the pre-trial hearing. At that hearing, V.A. admitted that while he kissed the children at all the visits, no one had complained to him or told him to stop. He also admitted that he had complained about the children not being forced to attend the visits, but that when staff informed him that they were not permitted to put hands on a child and force the child to attend the visits, he demanded the staff tell him "under what section of the law that it was under so I could go home and look it up." (Mar. 30, 2022 Tr. at 174-76.) After that hearing, the trial court ordered visits with the grandparents to resume twice a month.

{¶ 7} The trial on FCCS' permanent custody motion and V.A.'s motion for legal custody began on July 25, 2022, continued on July 26, and ended on July 29, 2022. R.A.'s motion for legal custody did not proceed, as she did not appear at trial, and service had not been perfected for that motion. (*See* July 25, 2022 Tr. at 5-6.) The court granted FCCS' motion for permanent custody, denied V.A.'s motion for legal custody, made extensive factual findings about J.A.'s participation in the case and failure to complete the case plan, V.A.'s difficult relationship with the children, and the best interests and needs of the children for placement. (*See generally* Oct. 20, 2022 Jgmt. Entry.) Specifically, the court found as follows:

> The Court finds Mother's testimony as to her abstinence from drug abuse after her release from Alvis [Halfway] House not credible. The Agency made multiple referrals for [J.A.] to [alcohol and drug] treatment * * *. She admitted to probably missing twenty-two (22) screens between November 15, 2021, and January 3, 2022. Between January 10 and June 23, 2022, she admitted to missing sixty-seven (67) screens. Between June 29 and the commencement of the trial on July 25, 2022,

she submitted 10 negative screens. In total, since her release from Alvis [Halfway] House on September 29, 2021, [J.A.] missed ninety-six (96) of the required screens. In the 30 days prior to trial, [J.A.] had one positive screen which she attributed to the fact that she "celebrated."

* * *

[C.D.3] has been in the custody of the Agency since March 31, 2017, while [C.D.1] and [C.D.2] have been in the custody of the Agency since February 27, 2018, yet [J.A.] is still not prepared to meet their *basic* needs.

* * *

Grandparents were very consistent in coming to visitations with the Children. Both [V.A.] and [R.A.] have a strong belief that the [C.D.1], [C.D.2], and [C.D.3] should be with family: "They are blood." However, they also believed that the Children should be forced to come to visitations regardless of the Children's wishes.

* * *

GAL Baron had seen the Children with [J.A.] approximately 35 times, with Grandparents (some in their home during kinship placement) approximately 15 times and with their foster parents (in both foster homes) approximately 50 times since January of 2018. Grandparent's visitations with the Children after their removal from kinship placement went well and the Children were happy to see them. There were no concerns with visitations in 2018 and 2019. GAL Baron resumed observing the in person visitations [after the Covid disruption and approval of CASA of Franklin County] in May of 2021. GAL Baron testified that in May of 2021, the visitations had changed. The Children were very reluctant to go into a visit. [J.A.] came to the car and asked [C.D.3] to come with her. He said no. [J.A.] grabbed [C.D.3] and he started screaming. It was so intense she put him down. He went straight to his foster mother for comfort. [C.D.3] continued to sometimes refuse visitation after [C.D.1] started to attend. From her observations and training, GAL Baron opined that [C.D.1] would approach [J.A.] but was "cautious" and "lukewarm" towards her.

GAL Baron observed no subsequent improvement in the family relationships. She observed that [C.D.1] kept her distance from [V.A.] and did not hug. [C.D.1] did not appear to want to be kissed by or hug Grandmother [R.A.]. When [C.D.2] entered

the lobby of the visitation center, he stood by his foster mother. Grandfather said in the Children's presence that he wanted the judge to order the Children to come into the visitation. [C.D.2] would not come into several visitations after that. [C.D.2] continued to keep his distance from Grandparents. He did not engage with [J.A.] or Grandparents. [C.D.3] had some interaction with [J.A.] and [R.A.] but was "distant." [C.D.3] appeared to avoid Grandfather and was unhappy when Grandfather put [C.D.3] on his lap.

* * *

Caseworker Watkins saw the Children in their foster home monthly. She opined: [C.D.1] was bonded with both foster parents and was very close with her foster mother; [C.D.2] and [C.D.3] interacted with and appeared to be bonded with both foster parents; and each of [C.D.1], [C.D.2], and [C.D.3] displayed evidence of having a strong healthy bond with their foster parents. *The Court finds that the Children do not have a strong healthy bond with Parents or Grandparents but have a strong bond with their foster parents.*

* * *

All children need and deserve permanency and security, some even more so than others. The Court finds that it would be very detrimental to their mental health and sense of security to separate [C.D.1], [C.D.2], and [C.D.3] from each other, and no party suggested this as a possible outcome.

* * *

[J.A.], age 37, has an extremely short period of sobriety, admitted to a long history of drug abuse, relapses, criminal behavior, incarceration, and has demonstrated instability as a parent. Since September 29, 2021, she has lived in the home of [B.W.], the father of her 3-month-old twins. She stated that she works five 12 hour days per week and has childcare for the twins. [The childcare provider would be providing much more parenting time than she for [C.D.1], [C.D.2], and [C.D.3].] [J.A.] believed that she now has a stable and supportive partner in providing a home for her young twins and that she and [B.W.] could do so the same for three children not his own. "His [three] kids are welcome; my [three] kids are welcome." She is number 2,492 on the waiting list of the Columbus Metropolitan Housing Authority and is on the HUD list. Her history with [B.W.] as a partner has been less than a year.

Unfortunately, the Court finds that [J.A.], even with the support of [B.W.], cannot provide for the basic and special needs of [C.D.1], [C.D.2], and [C.D.3]. *Even if she could do so, granting custody to [J.A.] is not the best option for the three Children.*

* * *

[C.D.3], [C.D.2], and [C.D.1] are only ages 5, 6, and 7. [C.D.1] and [C.D.2] have significant special needs. [V.A.] loves the Children; he has a strong belief that family should raise their "Blood." This was evidenced by his persistent efforts to obtain more visitation with the Children, doing his best to bond with the Children, taking parenting classes on his own, making improvements to his home, and his appearance at trial despite his injuries and obvious discomfort. Unfortunately, [V.A.]'s relationship with the Children did not progress enough to warrant an increase in visitation. If he were granted custody of [C.D.1], [C.D.2], or [C.D.3], the Court has no doubt that [V.A.] would do his very best to parent the Children, but the Court doubts [V.A.] would respect their boundaries and doubts he would comply with court orders restricting access of [J.A.] to the Children. Unfortunately, the Court finds that [V.A.], even with the help of [R.A.], cannot provide for the basic and special needs of the Children. *Even if he could do so, granting custody to [V.A.] is not the best option for the three Children.*

* * *

*The Court herein concludes that Franklin County Children Services had no duty to place the Children with their grandfather, [V.A.].* Even if the Agency herein had a duty to make "reasonable efforts" to effectuate a relative placement of [C.D.1], [C.D.2], and [C.D.3], the credible evidence demonstrated that the Agency made such efforts in this case. Those efforts were unsuccessful, in part, because Grandfather *did not comply* with the Agency's requirements and the Court's orders. Unfortunately, there is reason to doubt that he will comply with future orders of the Court and there is reason to doubt that he will be able to keep the Children in a safe and stable placement.

* * *

The Court finds that [C.D.3] was in the continuous custody of the Agency for purposes of R.C. 2151.414(B)(1)(d), from May 26, 2017, to the date of the October 9, 2018, filing of the

motion for permanent custody in 17 JU 4272, a period of over 12 months.

The Court finds that [C.D.1] and [C.D.2] were in the continuous custody of the Agency for purposes of R.C. 2151.414(B)(1)(d), from February 27, 2018, to the date of the March 3, 2022, filing of the second motion for permanent custody in 17 JU 14613, a period of over 12 months.

*Therefore, the Agency need not provide any additional evidence as to the First Part of the permanent custody test.*

* * *

The Court herein has considered *all* best interest factors as to each of [C.D.1], [C.D.2], and [C.D.3] and weighed all those factors to determine the best option for each child. Having considered the evidence as to the best interest of the Children, the Court finds that attempting to return [C.D.1], [C.D.2], and [C.D.3] to either Parent would be unsuccessful and contrary to their best interest. Placing any or all the Children in [V.A.]'s custody would not be in their best interest; it would not even be in [V.A.]'s best interest.

* * *

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that:**

**The Agency's October 9, 2018, motion for permanent custody of [C.D.3] and the Agency's March 3, 2022, motion for permanent custody of [C.D.1] and [C.D.2] , are granted.**

**The November 20, 2018, motion of [V.A.] seeking legal custody of [C.D.3] filed in 17 JU 4272 and the November 20, 2018, motion of [V.A.] seeking legal custody of [C.D.1] and [C.D.2] filed in 17 JU 14613 are each denied.**

**[C.D.1] and [C.D.2], and [C.D.3] are each committed to the permanent custody of Franklin County Children Services for the purpose of adoption.**

(Emphasis sic.)  *Id.* at 14-30.  J.A. and V.A. each filed notices of appeal, and these appeals have proceeded according to law.

{¶ 8}   As stated above, J.A. asserts three assignments of error with the court's judgment, and V.A. asserts one assignment of error.  But V.A.'s sole assignment of error is essentially identical to J.A.'s second assignment of error, and for that reason, we will address them together.  Accordingly, we will begin our analysis with J.A.'s first assignment of error, which asserts that the trial court's decision granting permanent custody and thereby terminating her parental rights was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 9}   Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children.  But parental rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child.  Accordingly, the state may terminate the parental rights of natural parents, but such termination must be in the best interest of the child. *See generally In re J.W.*, 10th Dist. No. 19AP-122, 2019-Ohio-4775, at ¶ 22 (citations and quotations omitted).  R.C. 2151.413 authorizes a public children services agency to file a motion requesting permanent custody of a child for which it has temporary custody, and when the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, the agency is required to file a permanent custody motion.  R.C. 2151.413(D)(1), cited in *In re J.W.* at ¶ 23. R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14.  "Clear and convincing evidence" is "more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *In re J.W.* at ¶ 14, and *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Rather, it means evidence that produces a firm belief or conviction as to the facts sought to be established. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, citing *Cross* at paragraph three of the syllabus.

{¶ 10} Moreover, a trial court's decision to grant a permanent custody must not be against the manifest weight of the evidence.  Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence.  Accordingly, an appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence.  Further, in reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must

make every reasonable presumption in favor of the judgment and the trial court's findings of facts. If the evidence is susceptible of more than one construction, the court of appeals must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment. *See generally In re J.W.* at ¶ 21 (citations and quotations omitted).

{¶ 11} Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply," and second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.* at ¶ 18-20. Relevant to this appeal, R.C. 2151.414(B)(1) provides the following circumstances under which FCCS is authorized to file a motion for permanent custody:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> * * *
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

Once it is established that one of the R.C. 2151.414(B)(1) circumstances is met, a trial court ruling on a motion for permanent custody must determine whether permanent custody is in the best interest of the child. R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that the court must consider in determining what is in the best interests of the child, and all of these factors are of equal importance under the statute. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). Weighing these factors, the trial court must determine that an award of permanent custody is in the child's best interest by clear and convincing evidence.

{¶ 12} As the trial court found, the "first half" of the permanent custody test is easily met in this case. It is uncontested that in accordance with R.C. 2151.414(B)(1)(d), C.D.1, C.D.2, and C.D.3 were each in the custody of FCCS for a period of over 12 months prior to the filing of the permanent custody motion. And as the trial court observed, FCCS "*need not provide any additional evidence as to the First Part of the permanent custody test.*" (Emphasis sic.) (Oct. 20, 2022 Decision & Jgmt. Entry at 28.) But there was even more supporting that first portion of the test, as the court also found, based on clear evidence in the record, that none of the children "can be placed with either Parent within a reasonable time and should not be placed with either Parent," as "notwithstanding reasonable case planning and diligent efforts * * * the Parents have failed continuously and repeatedly to substantially remedy the conditions" that caused removal of the children, that both the mother and father "demonstrated a lack of commitment toward the Children by failing to timely engage in and complete the reunification case plan," and that the father had "abandoned" the children. *Id.* at 28. But even without those additional findings, as a result of R.C. 2151.414(B)(1)(d) the only question left for the trial court to decide was the "second half" of the permanent custody test—whether the termination of parental rights and grant

of permanent custody to FCCS was established by clear and convincing evidence to be in the best interest of C.D.1, C.D.2, and C.D.3, using the five factors set forth in R.C. 2151.414(D)(1).

{¶ 13} And we cannot conclude that the trial court's decision that the trial court's judgment terminating J.A.'s parental rights and concluding that a return to the custody of J.A. was against the children's best interests was unsupported or against the weight of that evidence. Relevant to R.C. 2151.414(D)(1)(a), the evidence demonstrated that by May of 2021, all three children had difficult interactions with their mother and were wary of their grandfather, to the point that C.D.3 refused to visit with him and physically fought his mother when she attempted to physically force him out of the car to attend a visit. (Decision & Jgmt. Entry at 18.) C.D.2 refused to come to several visitations, and would not engage with either J.A. or V.A. *Id.* The children's foster mother testified to a similar story regarding C.D.1. *Id.* Based on this and other evidence presented at trial, the trial court concluded that "*the Children do not have a strong healthy bond with Parents or Grandparents but have a strong bond with their foster parents.*" (Emphasis sic.) *Id.* at 18. Relevant to R.C. 2151.414(D)(1)(b), the court found that C.D.1, during her therapy, indicated that "she cares for her biological family but expressed the desire to stay where she is." *Id.* at 21. C.D.2's therapist testified that "he doesn't remember living with [J.A.]; he didn't talk about her," but that he was beginning to work through his early trauma and starting to form a bond with his foster parents. *Id.* at 23. C.D.3 had only limited bonds with J.A. and V.A., and V.A. did not respect boundaries to make C.D.3 comfortable. Although on several occasions C.D.1, C.D.2, and C.D.3 expressed the desire to stay with their foster family, on July 22, 2022 C.D.2 did state that he wanted to live "with Mommie [J.A.]." *Id.* at 20. But the GAL indicated that was inconsistent with his wishes on three prior occasions, and on that same date when he entered a visit, he stood close to his foster mother rather than J.A. or V.A.

{¶ 14} The trial court determined that the most persuasive evidence of the children's desires could be found in the testimony of their respective therapists. *Id.* at 21. J.A. argues that consideration of this testimony as evidence of the children's wishes was in violation of the plain language of R.C. 2151.414(D)(1)(b), which states that the court must consider "[t]he wishes of the child, *as expressed directly by the child or through the child's guardian ad litem * * *.*" (Emphasis added.) *Id.* J.A. argues that this case is analogous to *In re Ridenour*, 11th Dist. No. 2003-L-146, 147-48, 2004-Ohio-1958, in which the court reversed

a judgment of permanent custody where neither the child directly nor the GAL testified as to the placement wishes of the child, and where the only evidence of the child's placement wishes was entered through the testimony of caseworkers. *Id.* at ¶ 46-47. *See also In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 40. We disagree. Here, the court's decision to disregard the in camera interviews of the children was driven by its concern that the foster mother may have unintentionally influenced their statements by allowing them to "practice" their in camera interviews prior to the court's decision to conduct those interviews and disregarded specific statements to the GAL for the same reasons. (Decision & Jgmt. Entry at 20-21.) This is substantially different than the situation faced in *Ridenour* and *Swisher*, where the courts did not conduct any in camera interviews and the GALS did not offer any information at all regarding the placement wishes of the children. In those cases, the evidence required to support a finding under R.C. 2151.414(D)(2)(b) did not exist at all, whereas here, the court determined it was best to disregard the evidence because although "the Court does not believe the Children's foster mother intended to influence and coach [C.D.1], *it will be extremely difficult for* [*J.A.*] *and* [*V.A.*] *to accept this as unintentional and difficult for them to believe that* [*C.D.1*] *was not coached on her answers.*" (Emphasis added.) *Id.* at 20. Indeed, if the trial court *had* considered those in camera interviews and statements of the GAL, the result would have been the same—both C.D.1 and C.D.2 specifically stated in their interviews that they wished to stay with their foster family and did not want to live with J.A. or V.A. *Id.* at 19. Moreover, the GAL expressed her belief that the children had not been coached and that these wishes were genuine. *Id.* at 20. Any error that occurred in the trial court's procedure in this case did not affect its judgment at all and was not objected to by the parties.

{¶ 15} Relevant to R.C. 2151.414(D)(2)(c), the court found that the children had been in the same foster home together since October 1, 2020, that J.A. was incarcerated in jail, then in prison from November 29, 2019 through November 2020, and was in Alvis Halfway House from November 2020 through September 29, 2021. C.D.1 was moved from the custody of J.A. in February 2015 to the temporary custody of R.A., back to the custody of J.A. again in April 2016, back to kinship placement with R.A. in February 2017, then to a different foster home in May 2018, and finally to her current foster home in October 2020. C.D.2 lived with J.A. from February 2016 through February 2018, then to kinship placement with R.A. until May 2018, then into a foster home with his sister C.D.1, and then

to his current foster home in October 2020. C.D.3 was placed in a foster home immediately after being discharged from the hospital after his birth until August 2017, then in kinship care with R.A. until May 2018, then into a foster home with his brother and sister until October 2020, and then finally to his current foster home. The children's foster parents are interested in adopting them.

{¶ 16} Relevant to R.C. 2151.414(D)(2)(d), the therapists of both C.D.1 and C.D.2 asserted that both children needed permanency and that changes in their current placement could be retraumatizing. *Id.* at 22 and 23. The court also concluded that C.D.3 has "no identified special needs perhaps because he has experienced less instability in his life." *Id.* at 23. But the court found that J.A.'s short period of sobriety prior to trial, her "long history of drug abuse, relapses, criminal behavior, [and] incarceration," as well as the short duration of her relationship with and financial dependence upon her current partner, B.W., demonstrated her continued unsuitability as a custodian. *Id.* V.A. was likewise deemed unable to care for the children—he and R.A. have lived together on and off for the past 45 years and for the 7 years prior to trial, raising 2 other teenage grandchildren. V.A. used a walker and "moved about very little even during the three day trial." *Id.* at 24. Notwithstanding what the court viewed as V.A.'s genuine love for his grandchildren, the court held that his "relationship with the Children did not progress enough to warrant an increase in visitation." *Id.* at 24. The court further observed that while it believed V.A. would do his best to parent, it "doubts [V.A.] would respect their boundaries and doubts he would comply with court orders restricting access of [J.A.] to the Children." *Id.* Ultimately, the court concluded that "even with the help of [R.A.]," V.A. "cannot provide for the basic and special needs of the Children," and therefore placement in his custody could not be in their best interest.

{¶ 17} Given all of the foregoing, the trial court's decision terminating J.A.'s parental rights, was clearly and convincingly supported by the evidence, and was not against the manifest weight of the evidence at trial. Accordingly, J.A.'s first assignment of error is overruled.

{¶ 18} J.A.'s second assignment of error and V.A.'s sole assignment of error both rest on FCCS' alleged noncompliance with Ohio's new kinship caregiver law, which became effective on September 30, 2021. *See* 2021 Ohio H.B. 110, Section 101.01 (enacting R.C. Sections 2151.4115 through 2151.4122). The statute requires a "public children services

agency or private child placing agency [to] make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in * * * Temporary custody of the agency." R.C. 2151.4116(A). Under R.C. 2151.4117(A), the court is directed "[a]t every court hearing" to determine whether FCCS has "continued intensive efforts to identify and engage appropriate and willing caregivers for the child." Under R.C. 2151.4118, the court may issue an order that the continuation of the child's placement in the home of a non-kinship caregiver is in the best interest of the child and that continued intensive efforts are unnecessary based on findings set forth in R.C. 2151.4119. And under R.C. 2151.4119, the juvenile court must find that the child has been living in a stable home environment with the current caregiver for the past twelve months, the current caregiver has expressed an interest in providing permanency for the child, and removing the child from that placement would be detrimental to the child's emotional well-being. Both V.A. and J.A. assert that at hearings after the effective date of the statute, the trial court failed to determine whether or not FCCS had engaged in "intensive efforts" to place C.D.1, C.D.2., and C.D.3 with V.A.

{¶ 19} But the statute does not require intensive efforts to place a child with a kinship caregiver, it requires intensive efforts to "identify and engage" a kinship caregiver. As V.A. was already identified and engaged in the case and had already expressed a desire to take custody of the children by virtue of his motion for legal custody, it is fatuous to argue that FCCS failed to comply with the statute—it clearly made the intensive efforts required, even before the statute was enacted and became effective.

{¶ 20} As such, the only argument remaining under these assignments of error is that the court failed to make the express order of R.C. 2151.4118 based on the express findings set forth in R.C. 2151.4119. But this argument too fails—in the trial court's judgment entry granting FCCS' permanent custody motion, the court specifically found that C.D.1, C.D.2, and C.D.3 had been living with the current foster parents from October 1, 2020 onwards, (Decision & Jgmt. Entry at 21), that they had strong bonds with the foster parents, (*id.* at 18), that the foster parents are interested in adoption, (*id.* at 24), and that any change in placement would be traumatizing to the children. *Id.* at 22-23. These are, of course, the exact findings requirement by R.C. 2151.4118 and 2151.4119. Accordingly, even though the trial court did not specifically mention the code section numbers of the new kinship caregiver law, both it and FCCS satisfied the requirements of that law in this case.

For those reasons, we overrule J.A.'s second assignment of error and V.A.'s sole assignment of error.

{¶ 21} Finally, J.A. asserts that the trial court erred by failing to appoint separate counsel for C.D.1, who had expressed her desire to reside with V.A. and R.A., as these placement desires conflicted with the GAL's placement recommendation. According to testimony at the trial and the report of the GAL, C.D.1 had expressed the wish to live with her grandparents on November 29, 2019, December 30, 2019, and January 20, 2020. (*See*, *e.g.,* Jan. 6, 2022 Guardian Ad Litem's Report at 40-42.) The GAL also reported that on August 20, 2020, C.D.1 stated that she wants to live with her grandparents:

> but also expressed that she was "afraid" if that were to occur. Despite attempts to understand the fear, she was unable to articulate the fear Her facial expression also indicated some real anxiety. The GAL informed the Court that [C.D.1]'s expressed wishes were not consistent with the GAL's recommendation at that time, but the Court declined to appoint counsel at that time.

*Id*. at 41-42. In the months prior to trial, C.D.1's consistent wishes were to remain with the foster family—"she has been asking questions about family, what adoption means, and if the foster family would adopt her (and her brothers), to which the family answers in the affirmative." *Id*. at 42. The GAL's report continued:

> She did not appear excessively distressed at the thought of not seeing the extended family. GAL informed her that court date is coming up soon and it was important for her to tell GAL what she wanted. (She has been reluctant to discuss placement over the last few months). She seemed very worried that she would be forced to leave the home. GAL told her that is the very reason why it is important to say what she wants. She clearly stated that she wants to remain with the foster family. It should be noted that she looks forward to the monthly visits with grandparents primarily because her older cousin is there and she spends most of her time with him. A reminder that child does not state she looks forward to spending time with family, but is more interested in the gifts and dinner provided.

*Id*. at 42-43. It is true that "when a guardian ad litem who is appointed as the juvenile's attorney recommends a disposition that conflicts with the juvenile's wishes, the juvenile court must appoint independent counsel to represent the child." *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, ¶ 18. But we have held that "Parents have standing to appeal

an error committed against their children only if the error is prejudicial to the parents' rights." *In re S.S.*, 10th Dist. No. 12AP-322, 2012-Ohio-4794, ¶ 26. *See also In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, ¶ 15 (10th Dist.), and *In re B.L.*, 10th Dist. No. 04AP-1108, 2005-Ohio-1151, ¶ 44. Consequently, a parent has standing to appeal an error committed against a child only when the parent and child share interests in that they both seek reunification. *In re B.L.* at ¶ 44.

{¶ 22} Here, even though C.D.1 expressed the desire to live with her grandparents earlier in the case, she definitely did not express the desire to be placed in the custody of her mother. And even more importantly, it is beyond dispute that C.D.1 had abandoned her conflicting desire well prior to the trial in this case. By the time the GAL filed her report, let alone the time of the trial itself, C.D.1 had become unwavering in her desire to stay with her brothers and her foster family. Accordingly, J.A. lacks standing to raise this assignment of error—C.D.1 never sought reunification and abandoned her desire to live with her grandparents, and therefore J.A.'s interests did not align with those expressed by C.D.1 at any point. J.A.'s third assignment of error is therefore overruled.

{¶ 23} For all these reasons, we conclude that appellant J.A.'s three assignments of error are overruled, appellant V.A.'s sole assignment of error is overruled, and the judgments of the Franklin County Court of Common Pleas, Domestic Relations, Juvenile Branch granting permanent custody of C.D.1, C.D.2, and C.D.3 to FCCS are affirmed.

*Judgments affirmed.*

MENTEL, P.J., and LELAND, J., concur.

———————————